STATE of Missouri, Respondent,

v.

Joe THEUS, Appellant.

Nos. WD 51810, WD 53731.

Missouri Court of Appeals,
Western District.

March 24, 1998.

Motion for Rehearing and/or Transfer to
Supreme Court Denied April 28, 1998.

Application for Transfer Denied
June 16, 1998.

Rosemary E. Percival, Asst. Public Defender, Kansas City, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Karen L. Kramer, Asst. Atty. Gen., Jefferson City, for respondent.

HANNA, Judge.

The defendant, Joe L. Theus, was found guilty by a Jackson County jury of second degree murder of Prentiss Hunt, § 565.021.2, RSMo 1994; robbery first degree of Gregory Smith, § 565.020, RSMo 1994; assault in the first degree of Chickoiyah Miller, § 565.050, RSMo 1994; and three corresponding counts of armed criminal action, § 571.015, RSMo 1994. The court sentenced the defendant as a prior and persistent offender, § 558.016, RSMo 1994, to consecutive terms of twenty years imprisonment for robbery first degree, life imprisonment for murder second degree and ten years for assault in the first degree,

all concurrent to equal terms of imprisonment for the corresponding crimes of armed criminal action. After a post-conviction evidentiary hearing, the motion court entered findings of fact and conclusions of law denying the defendant's Rule 29.15 motion.

On appeal, the defendant argues that three of the state's peremptory challenges violated the mandate of *Batson*,[1] that the evidence did not support his conviction for assault first degree, that the court permitted inadmissible testimony regarding the police's videotaped lineup, and that his attorney was ineffective.

On the evening of July 8, 1994, Cherylene Berry was driving a 1982 two-door Honda. Her passengers were Gregory Smith, who was sitting in the front seat, and Michelle Reese, Chickoiyah Miller and Candice sitting in the backseat. They were going to perform at a party at the Kansas City Community Center. On the way there, Berry noticed a medium-sized gray vehicle following her. She recognized the driver of the gray car as her ex-boyfriend, Clifford White. She was also previously acquainted with the defendant who was a passenger in White's car. White followed Berry into the parking lot of the community center. Berry got out of her car. The defendant asked her if Smith was in the car. Berry leaned into the car and told Smith that his friends wanted him. She then turned to let her passengers out of the two-door Honda.

When she turned back around, the defendant was standing next to her with a gun. He said he was looking for Smith. He pushed Berry back into the car and slammed the door shut. He partially covered his face with his shirt and told the passengers to put their hands up and to look the other way. Smith asked, "What's up?" The defendant responded, "You know what's up." Through the open sunroof, he ordered Smith to take off his jewelry. Although the evidence was *conflicting*, there was evidence that the defendant told Smith to hurry up, and then looked in the backseat and asked, "Who's back here?" and recognized three young girls. The defendant then ordered Smith to hand him the video camera. Because he was so nervous, Smith handed the defendant the empty camera bag, forgetting that they had taken the camera out of the bag to test it. The defendant fired through the sunroof into the car. Smith gave his jewelry to the defendant.

At this point, Prentiss Hunt, a maintenance man, walked around the corner of the building and headed towards Berry's car. The defendant told him to get back and fired a shot at Hunt who grabbed his chest and fell to the ground. The defendant shot into Berry's car again and left the scene in White's car.

After the defendant left, Miller realized that a bullet had struck her foot. Berry drove to Children's Mercy Hospital where the shattered bone in Miller's foot was treated. In the meantime, the police responded to the scene and found Hunt laying on the ground. Mr. Hunt told police that he had walked around the corner when an unknown person shot him. He died later at the hospital from the gunshot wound to his chest. The police recovered two spent shell casings and an empty video bag from the scene.

The police were called to the hospital. Berry identified the defendant and White as the individuals involved. She accompanied them to the police station where she identified the defendant from a previously videotaped police lineup and identified White from a photographic lineup. Nearly a week later, the police sought Berry after they learned that she had given them a false name. When she was located and brought in for questioning, she explained that she gave the police a false name because there was a warrant out for her arrest, and she did not want to be arrested. She also told the police where they could find Michelle Reese. Reese was located and identified the defendant from the videotaped lineup and identified White from the photographic lineup. About a month after the incident, detectives located Smith. He also picked the defendant out of the same videotaped lineup. From the photographic lineup, he identified White.

The day after the incident, the defendant was at the police station regarding an unre-

---

1. *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

lated event. While at the station, the defendant was told that he was wanted for questioning regarding the death of Prentiss Hunt. After being given his *Miranda* [2] warning, he agreed to talk to the police. He denied any involvement, and claimed he was somewhere else during the evening of July 8, 1994. The defendant claimed that he went with his girlfriend to rent a video, and then returned to their home where they spent the evening watching television with his girlfriend's friend, Olivia Mayfield. Between 10:30 and 11:00 P.M., the three of them left the house to pick up his daughter from his sister's house. They returned home and spent the remainder of the evening there. Ms. Mayfield went home at approximately 1:30 A.M. that evening. The police contacted the defendant's girlfriend, his sister, and Olivia Mayfield, who all corroborated the defendant's alibi.

At trial, the defendant's girlfriend, his sister, Olivia Mayfield, and the manager of a video store presented his alibi defense. Their testimony placed the defendant at home all evening, except when he rented a video and when he picked up his daughter from his sister's home. The physical evidence consisted of a slug, which was removed from Hunt's body, two spent shell casings found at the scene, and an empty video camera bag. Examination of the car revealed a bullet hole through the top of the driver's seat. Two slugs were also retrieved from the floor of the backseat of Berry's car. Ballistic tests indicated that the slugs and the shell casings had all been fired from the same gun. Fingerprints taken from the car could not be connected to the defendant.

In his first point on appeal, the defendant claims that the trial court erred in overruling his *Batson* based objection to the state's use of its peremptory challenges to remove three African–American venirepersons; Edward Nichols, Rose Johnson, and Helen Nelson. The defendant argued that the state's race-neutral explanation was pretextual. The state explained that its questions of the venire about their friends or relatives in the penal system were designed to determine the extent of contact which they may have had with their friends or relatives who were in

custody, not whether they had friends or family in prison. It was on this basis that the state exercised its peremptory strikes. The defendant contends that the state's voir dire questions violated the dictates of *Batson* because the greater portion of the prison population is African–American. The prosecutor stated to the trial court that "[w]e did not strike persons that simply stated that they had friends or relatives in the penitentiary who indicated that they didn't have any contact with them or didn't have any personal knowledge of the circumstances." The trial court found that the state's explanation was sufficiently race-neutral and overruled the objection.

In *Batson v. Kentucky,* the Supreme Court determined that the state's use of its peremptory challenges was subject to the Equal Protection Clause. 476 U.S. 79, 89–90, 106 S.Ct. 1712, 1719, 90 L.Ed.2d 69 (1986). As such, Missouri has established a three-part test to evaluate objections based on *Batson* grounds. In *State v. Parker,* the Missouri Supreme Court said:

> First, the defendant must raise a *Batson* challenge with regard to one or more specific venirepersons struck by the state and identify a cognizable racial group to which the venireperson or persons belong. The trial court will then require the state to come forward with reasonably specific and clear race-neutral explanations for the strike ... Assuming the prosecutor is able to articulate an acceptable reason for the strike, the defendant will then need to show that the state's proffered reasons for the strikes were merely pretextual and that the strikes were racially motivated.

836 S.W.2d 930, 939 (Mo. banc 1992) (citations omitted).

The defendant makes his pretextual argument on the premise that the existence of similarly situated white jurors, who were not struck by the prosecution, is probative of pretext. He argues that Mr. Harding, a white venireperson, was not struck and was never asked about his contact with his mother while she was in prison. Conversely, the defendant argues, Ms. Nelson was struck

---

**2.** *Miranda v. Arizona,* 384 U.S. 436, 443–45, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966).

even though the state did not inquire as to the contact she had with her son while he was in prison.

■ If the state gives a reasonably specific, race-neutral reason for their peremptory strikes, it will be deemed sufficient unless there is "discriminatory intent in that explanation." *State v. Weaver*, 912 S.W.2d 499, 509 (Mo. banc 1995), *cert. denied*, — U.S. ——, 117 S.Ct. 153, 136 L.Ed.2d 98 (1996)(citing *Hernandez v. New York*, 500 U.S. 352, 358–60, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395 (1991)). While the burden of proving "racial motivation rests with, and never shifts from, the opponent of the strike," *Purkett v. Elem*, 514 U.S. 765, 767–69, 115 S.Ct. 1769, 1771, 131 L.Ed.2d 834 (1995), "[a] reviewing court will set aside the trial court's findings as to whether the prosecutor discriminated in the exercise of his peremptory challenges only if such finding is clearly erroneous." *Weaver*, 912 S.W.2d at 509 (citing *State v. Blankenship*, 830 S.W.2d 1, 15 (Mo. banc 1992)). *See also State v. Antwine*, 743 S.W.2d 51, 66 (Mo. banc 1987)(ruling that a finding is "clearly erroneous" only when the reviewing court is left with the "definite and firm impression that a mistake has been committed.")

■ Since the state could conceal the true reasons for removing venirepersons of a certain race by simply inventing neutral reasons, a trial court should consider the plausibility of the explanation "in light of the totality of the facts and circumstances surrounding the case." *Id.* at 939 (citations omitted). Facts that detract from and lend credence to the explanation are relevant, including "the existence of similarly situated white jurors who were not struck by the prosecution is certainly probative of pretext." *Id.* at 940 (citing *State v. Kempker*, 824 S.W.2d 909, 910–11 (Mo. banc 1992)). *See also State v. Butler*, 731 S.W.2d 265, 269 (Mo.App.1987).

■ The state concedes that it did not inquire about Harding's contact with his mother because his responses demonstrated that he had no personal knowledge of the

circumstances of her incarceration. Harding stated that his mother's incarceration occurred over 30 years ago, and he did not know the type of facility in which she had been imprisoned and only knew the circumstances of her case from the newspapers.

With respect to Nelson, however, the state admits that it never specifically asked her if she had contact with her son while he was incarcerated because her earlier answers made it clear that she maintained a close relationship with him. She responded to the state's inquiries about her son by indicating that:

> I have a son who just got out of the penitentiary. He's—he's in a halfway house ... when he and I talked he tells me the truth when he does something and when he doesn't do it. He tells me he didn't do it. So we understand each other, you know.... He blames himself for a lot of things that I know of.

It is apparent from Nelson's response, without any additional follow-up questioning, that she had maintained contact with her son and knew of the circumstances surrounding his recent incarceration. She believed her son told her the truth that he was not guilty of the crime which resulted in his present incarceration. The circumstances of the incarceration of Harding's and Nelson's relatives, and the degree with which they were involved with the relatives' incarceration, were not similar and did not necessarily require additional questions to determine the extent of their contact with their relatives.

Deference to the trial court's findings on the issue of discriminatory intent makes particular sense because the findings will largely turn on an evaluation of credibility, and the best evidence will often be the demeanor of the attorney who exercises the challenge. *See Hernandez*, 500 U.S. at 364–66, 111 S.Ct. at 1869. The trial court ruled that the state's reasons were not pretextual. The state's reason to strike Nelson, and not Harding, was a legitimate use of its peremptory strike and, therefore, the court's ruling was not clearly erroneous.[3] Point denied.

---

**3.** The state also notes that the it struck a white venireperson because he visited his son while he

was incarcerated, and that, even after the state

In the defendant's second point, he claims that it was error for the trial court to deny his motion for judgment of acquittal on assault in the first degree and the corresponding armed criminal action charge, because the evidence was insufficient to sustain the jury's verdicts. The defendant argues that the state did not prove that he acted knowingly, rather than recklessly, in shooting Miller in the foot.

In assessing the sufficiency of the evidence, an appellate court must view the evidence, and all reasonable inferences to be drawn therefrom, in the light most favorable to the verdict. *State v. Grim*, 854 S.W.2d 403, 405 (Mo. banc 1993). A reviewing court's job is only to determine whether the evidence is sufficient from which a reasonable juror might have found the defendant guilty beyond a reasonable doubt. *See State v. Williams*, 623 S.W.2d 552, 553 (Mo.1981); *State v. Martin*, 940 S.W.2d 6, 8 (Mo.App. 1997).

 Felony assault in the first degree is defined as "[a] person [who] attempts to kill or *knowingly causes or attempts to cause* serious physical injury *to another person.*" (emphasis added). Section 565.050, RSMo 1994. Intent may be established by circumstantial evidence, or may be inferred from surrounding facts. *See State v. White*, 847 S.W.2d 929, 933 (Mo.App.1993)(citing *State v. Jones*, 716 S.W.2d 315, 319 (Mo.App.1986)). A defendant's mental state may be reasonably inferred from the act itself. *Id.* If the defendant "knows the probable consequences of the assault will be to injure any one or all of the persons he sees or is otherwise bound to believe are before him, he will be as liable as to any one of them." *State v. Stewart*, 811 S.W.2d 805, 808 (Mo.App.1991)(quoting *State v. Macone*, 585 S.W.2d 64, 67 (Mo.App.1979)).

 This court held in *State v. Smith*, that "in shooting several times into [an occupied] car showed an intent to do conduct which could kill an occupant of the vehicle." 747 S.W.2d 678, 680 (Mo.App.1988). As such, the court ruled that such conduct "went beyond recklessness." *Id.* Although the trial evidence here was conflicting, there was suffi-

cient evidence that the defendant observed and commented that there were three girls sitting in the backseat of the Honda before he fired the first shot. The evidence was clear that before he fired the second shot into the vehicle, he was aware of the people in the backseat. Thus, evidence supports the fact that the shooting was conduct done knowingly. Point denied.

The defendant's next point concerns the admissibility of Detective Ray Lenoir's testimony that the videotaped lineup was prepared prior to the commencement of the investigation of this case. Detective Lenoir testified that witness Reese identified the defendant as the person who shot into the car from the videotaped lineup. He then testified that the lineup was prepared prior to this investigation. The defendant had filed a motion *in limine* prior to trial to preclude this testimony and, at trial, made a timely objection which was overruled. The state made no argument to the trial court regarding the admissibility of Detective Lenoir's testimony, except that it was admissible to show that the videotape was made before the crime was committed. There may have been a relevant basis for the officer's testimony but none was given to the trial court, nor has any been suggested on appeal. We do not see the probative value and it was of doubtful, if any, relevance. On appeal, the state does not attempt to justify the admissibility of the testimony. The defendant contends that the trial court erred because the fact that he was in a police lineup before the investigation of his case was evidence that he had been involved in other crimes. *See State v. Bernard*, 849 S.W.2d 10, 13 (Mo. banc 1993).

 If the evidence "shows that the defendant has committed, been accused of, been convicted of, or definitely associated with another crime or crimes," it runs afoul of the rule that "[c]riminal defendants have a right to be tried only for the offense for which they are charged." *State v. Hornbuckle*, 769 S.W.2d 89, 96 (Mo. banc 1989)(citing *State v. Williams*, 652 S.W.2d 102, 110 (Mo. banc 1983)). Such evidence is "inadmis-

exercised its peremptory strikes, six African-American jurors served on the jury.

sible for the purpose of showing the propensity of the defendant to commit such crimes." *Bernard*, 849 S.W.2d at 13 (citing *State v. Reese*, 364 Mo. 1221, 274 S.W.2d 304, 309 (1954)). "Generally, placing evidence before a jury of other crimes committed by the defendant constitutes prejudicial error." *State v. Beasley*, 731 S.W.2d 255, 256 (Mo.App.1987)(citing *Osborne v. United States*, 351 F.2d 111, 115 (8th Cir.1965)).

Understandably, there are no Missouri cases addressing videotaped lineups, which were prepared before the investigation of the crime, used to identify the accused. The typical videotaped lineup is similar to "mug shots" when the criminal information has been redacted. The parties urge us to apply the case law regarding the admissibility of police photographs, which are used to identify an accused.

▮ Police photos from crime books and videotaped lineups are an integral part of a police investigation. However, in order to protect an accused from the stigma of "other crime" evidence, the courts require that all incriminating evidence be masked before allowing their admission into evidence. Missouri law holds that a police photo is admissible evidence when the photo, and/or accompanying testimony, does not disclose a defendant's prior arrests or convictions. *See State v. Young*, 943 S.W.2d 794, 798 (Mo.App.1997)(citing *State v. Tivis*, 933 S.W.2d 843, 846 (Mo.App.1996)). Missouri case law has been careful to mask inculpatory information. *See State v. McCauley*, 831 S.W.2d 741, 742 (Mo.App.1992). Our courts have also determined that testimony accompanying the admission of photo lineups is permissible, as long as there is no link to a defendant's prior crime. *See State v. Quinn*, 693 S.W.2d 198, 199 (Mo.App. 1985) (ruling that a police officer's testimony that the photos came from his "crime books" established that the defendant had a prior criminal record).

▮ A videotaped lineup does not have the stigma of prior police involvement attached to it and its use here, without the officer's testimony, was proper. However, when the state insisted that the police witness testify that the lineup was prepared before the investigation, the defendant, who was part of the lineup, was then identified as probably having previously been involved in some type of activity that caused him to be placed in a police lineup. We are concerned here because proper evidence was tainted by testimony that was unnecessary and irrelevant. A videotaped lineup that includes the accused, which was assembled before the crime had been committed, could reasonably indicate to a lay person that the defendant had been involved in some previous criminal activity. While appearing in a videotaped lineup does not suggest that he was guilty of a crime, it would not be unexpected for the jury to infer some criminal activity from his presence in the lineup. The testimony, unnecessarily, casts the defendant in an unfavorable position. Thus, the trial court erred because the evidence was irrelevant and casts suspicion on the defendant. *See State v. Caldwell*, 695 S.W.2d 484, 486 (Mo.App. 1985).

▮ However, such error may be deemed harmless and non-prejudicial if the court is satisfied beyond a reasonable doubt "'that the error did not contribute to the defendant's conviction.'" *Beasley*, 731 S.W.2d at 257 (quoting *U.S. v. Bishop*, 492 F.2d 1361, 1365 (8th Cir.1974)). The admission of irrelevant "evidence, even of other crimes, will not be reversed on appeal absent a showing of prejudice." *State v. Henderson*, 826 S.W.2d 371, 374 (Mo.App.1992)(citing *State v. Hampton*, 648 S.W.2d 162, 166 (Mo.App. 1983)). Reversal is not automatic but is "dependant on the circumstances of the case" and would depend on "the extent of prejudice therefrom." *State v. Woody*, 699 S.W.2d 517, 524 (Mo.App.1985) (citations omitted). *See also State v. Gilmore*, 681 S.W.2d 934, 942 (Mo. banc 1984).

For example, in *State v. Woody*, the court found that any prejudice to the defendant, regarding the prosecutor's two questions concerning whether the defendant made a living selling drugs, was so minimal that reversal of the conviction was not warranted. 699 S.W.2d at 524. In *State v. Hampton*, the defendant was charged with the robbery of a wallet and checkbook. 648 S.W.2d 162, 164

(Mo.App.1983). The incriminating evidence was found while police officers were executing a search warrant and arresting the defendant on unrelated charges. *Id.* The court ruled that, under the circumstances of this case, the trial court did not err in admitting the police officer's testimony, as it did not constitute proof that the defendant committed other crimes. *Id.*

Other than the fact that the defendant was in a lineup prepared before the investigation commenced, there is no other evidence linking the defendant to previous criminal activity. Moreover, the defendant does not suggest that the matter was pursued by the state. Apparently, the testimony was isolated. There was no other mention of it in the testimony and no mention made in closing argument.

Numerous Missouri courts, including our Supreme Court, have established that any error in admitting evidence of prior arrests may be deemed harmless and nonprejudicial when the evidence of defendant's guilt in the charged crimes was "overwhelming." *State v. Neil,* 869 S.W.2d 734, 737 (Mo. banc 1994). *See also State v. Jimmerson,* 891 S.W.2d 470, 471–72 (Mo.App.1994)(ruling that the overwhelming evidence of the defendant's guilt and the testimony of the eyewitness victim, deemed the evidence of his prior criminal record harmless); *State v. Sanders,* 748 S.W.2d 835, 836 (Mo.App.1988).

■ Although the testimony of prior criminal activity may be highly prejudicial, particularly when balanced against the typical absence of probative value, *see State v. Garrett,* 825 S.W.2d 954, 958 (Mo.App.1992), the circumstances here do not lead to such a conclusion because of the strength of the state's case. *See State v. Motley,* 740 S.W.2d 313, 317 (Mo.App.1987). The defendant was identified by witnesses Berry, Miller and Smith. Berry knew White and the defendant before the crimes in question. All three witnesses had coinciding versions of the

events. We find that the erroneous admission of the evidence did not prejudice the defendant to the level that mandates reversal since it was an isolated incident and the evidence of his guilt was substantial. Point denied.

Finally, the defendant claims that the motion court erred in denying his Rule 29.15 motion because his trial counsel was ineffective in failing to request an instruction on the lesser-included offense of assault in the second degree because the evidence supported a reckless act of shooting into the car.[4]

Our review of the motion court's denial of the Rule 29.15 motion is limited to a determination of whether the motion court's findings of fact and conclusions of law are "clearly erroneous." Rule 29.15(j) and (k) V.A.M.R.; *Moore v. State,* 827 S.W.2d 213, 215 (Mo. banc 1992). Such findings are clearly erroneous if, after a review of the record, the court is left with the "definite and firm impression that a mistake has been made." *Id.* (citing *Richardson v. State,* 719 S.W.2d 912, 915 (Mo.App.1986)).

To establish ineffective assistance of counsel, the movant must prove that counsel did not demonstrate the customary skill and diligence that a reasonably competent attorney would display under the same or similar circumstances, and that the movant was prejudiced thereby. *Strickland v. Washington,* 466 U.S. 668, 686–88, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). In order to show prejudice, the movant must prove that counsel's omissions resulted in "prejudice to his position and deprived him of substantial rights." *Love v. State,* 670 S.W.2d 499, 503 (Mo. banc 1984)(citing *Careaga v. State,* 613 S.W.2d 863, 867 (Mo.App.1981)).

The evidence presented at the post-conviction hearing consisted of defense counsel's admission that there was a basis for conviction on the lesser-included offense, and acquittal on the offense of assault in the first degree. She also admitted that she did not

4. The greater offense (for which the defendant was found guilty) sets forth that: "[a] person commits the crime of assault in the first degree if he attempts to kill or knowingly causes or attempts to cause serious physical injury to another person." Section 565.050, RSMo 1994. The lesser-included offense sets forth that "[a] person commits the crime of assault in the second degree if he ... (3)[r]ecklessly causes serious physical injury to another person." § 565.060, RSMo 1994.

submit a jury instruction on assault in the second degree because she "simply missed" the instruction. She conceded that it would have been better to give the jury a range of possibilities on this count, so that they could choose to convict on a lesser charge. However, defense counsel also testified that her theory of defense, and her entire closing argument, was based on alibi and misidentification. She conceded that she had no intention of arguing to the jury that the defendant's shots into the car were reckless.

The motion court found that the decision not to require a lesser-included offense instruction was made as a matter of trial strategy and, generally, such a determination will not result in a finding of ineffective assistance of counsel. *See State v. Williams*, 784 S.W.2d 309, 315 (Mo.App.1990)(citing *State v. Olson*, 636 S.W.2d 318, 322 (Mo. banc 1982)). Specifically, the motion court found the following:

28. At the hearing on the motion in this case, trial counsel conceded that she, in retrospect, committed an 'oversight' by failing to request that the court order this instruction. Trial counsel's assertions at the hearing seem wholly inconsistent with what the record indicates was a trial strategy undertaken to establish that Movant had been misidentified because Movant, in fact, had been at home at the time of the homicide with family and friends watching television.

29. If a request for a jury instruction on a lesser offense is not supported by evidence or is inconsistent with the theory of defense, the lack of a request for it is not proof of ineffective assistance of counsel. *Hackney v. State*, 778 S.W.2d 776 (1989). The instruction of assault in the second degree is not supported by Movant's evidence since trial counsel's theory of defense was misidentification, not that Movant committed assault without intent. Since evidence supporting recklessness would essentially require an admission that it was the defendant who committed the assault **and** murder, trial counsel wisely elected not to seek this instruction. Moreover, Missouri law provides that an objectively reasonable choice not to submit an available instruction does not constitute ineffective assistance of counsel. *Love v. State*, 670 S.W.2d 499 (Mo. banc 1984). Finally, the reasonableness of employing an all-or-nothing strategy, particularly in a homicide prosecution, is not affected by the failure of the jury to acquit. *Id.*

30. Because the Movant would have been prejudiced by a request for the instruction on the lesser offense of assault in the second degree, the failure to request this instruction will not support a finding of ineffective assistance of counsel. Accordingly, this point is denied.

 The motion court considered the defendant's trial attorney's testimony regarding her "oversight" in failing to ask for the lesser-included offense instruction. The court concluded that such omission was consistent with the defense theory of alibi and noted the inconsistency of arguing that the defendant was not there, but, if the jury believed he was there, to convict him of a less serious crime. An appellate court "must defer to the motion court's determination of credibility" regarding the testimony of witnesses at evidentiary hearings. *Proctor v. State*, 809 S.W.2d 32, 36 (Mo.App.1991)(citing *Childress v. State*, 778 S.W.2d 3, 5 (Mo.App. 1989)). Trial counsel will not be convicted of ineffective assistance for employing the best defense for her client, that did not include a lesser-included offense instruction which could result in a compromise verdict convicting her client. *See Love*, 670 S.W.2d at 501–02. Because the lesser-included offense instruction would have been inconsistent with the defense asserted at trial, the motion court's findings of fact were not clearly erroneous. Point denied.

The judgment of convictions and denial of the Rule 29.15 motion are affirmed.

LOWENSTEIN, P.J., and BRECKENRIDGE, J., concur.